UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

**PRISCILLA SEDA-RODRÍGUEZ, et al.,**

**Plaintiffs,**

**v.**

**CENTRO MÉDICO EPISCOPAL SAN LUCAS PONCE, INC. d/b/a HOSPITAL SAN LUCAS PONCE, et al.,**

**Defendants.**

**Civ. No. 23-1207 (ADC)**

## OPINION AND ORDER

### I. Introduction

Centro Médico Episcopal San Lucas Ponce, Inc. d/b/a Hospital San Lucas Ponce ("HESL"), joined by co-defendants Dr. Roberto Burgos-Rodríguez ("Dr. Burgos") and Southern Obstetrics & Gynecology Center, PSC ("SOGC," and together with HESL and Dr. Burgos, "defendants"), ask the Court to determine whether the liability caps afforded to teaching hospitals and their medical faculty by Section 7 of Puerto Rico's Act No. 136-2006, P.R. Laws Ann. t. 23, § 10035, known as the "Regional Academic Medical Centers of Puerto Rico Act" ("RAMC Act"), would apply to them in the event that they are found liable to Priscilla Seda-Rodríguez ("Ms. Seda,") and her child "I.M.S." (together with Ms. Seda, "plaintiffs") for her claims of medical malpractice. The Court had previously denied summary judgment on this issue in an Omnibus Opinion and Order due to the contested state of the material facts. *See Seda-Rodríguez v. Centro Médico Episcopal San Lucas Ponce, Inc.*, No. CV 23-1207 (ADC), 2025 WL 918730

(D.P.R. Mar. 26, 2025); **ECF No. 184**. However, it afforded HESL and Dr. Burgos the opportunity to file a second or supplemental motion specifically addressing whether Ms. Seda was treated within HESL's residency program and whether Dr. Burgos was in the exercise of his teaching duties when he treated her. *See* **ECF No. 184** at 28-29. It also denied SOGC's request for summary judgment because its liability depended on the answer to these questions. *Id.*, at 28.

Heeding the Court's instruction, on October 17, 2025, HESL filed a supplemental motion for partial summary judgment and accompanying statement of uncontested material facts. **ECF Nos. 208, 209**. HESL now presents a fuller picture of the workings of its residency program via a lengthy statement under penalty of perjury subscribed by Dr. María de los Ángeles Valentín-Mari ("Dr. Valentín"), Director of HESL's Graduate Medical Education Program. **ECF No. 209-1**. HESL also submitted a like statement from Dr. Burgos which, in conjunction with plaintiffs' medical record, purports to establish that Dr. Burgos was in the performance of his academic and teaching duties at HESL when he attended Ms. Seda during her delivery. All of this in hopes of establishing that the RAMC Act's liability caps cover plaintiffs' claims.

Plaintiffs moved to strike Dr. Valentín's statement because, according to them, she was never properly disclosed as a possible witness. **ECF No. 219**.[1] Simultaneously, plaintiffs filed an opposition to the supplemental motion for summary judgment and an opposing statement of uncontested material facts. **ECF Nos. 220, 220-8**. After substantial motion practice on requests

[1] The Court recently denied the motion to strike. **ECF No. 251**.

for extensions of time and on the allowance of replies and sur-replies, the matter was finally submitted to the Court on February 9, 2026.

For the reasons set forth below, the Court **GRANTS** the supplemental motion for partial summary judgment.

## II. Procedural Background

On April 28, 2023, plaintiffs filed the above-captioned complaint against defendants. **ECF No. 1**. On September 22, 2023, plaintiffs moved to amend the complaint, leave for which the Court granted. **ECF Nos. 28, 32**. In their amended complaint, filed at **ECF No. 33**, plaintiffs allege that SOGC, through Dr. Burgos, provided obstetrics and gynecology services to Ms. Seda from May 7, 2020, up to the date of I.M.S.'s birth on December 20, 2020. Plaintiffs further allege that the delivery was performed at HESL's facilities, and that Ms. Seda was attended by Dr. Burgos, resident physicians, and hospital nursing staff. Plaintiffs claim that Ms. Seda was never informed of the possibility of being treated by medical residents within HESL's residency program. It is alleged that Ms. Seda suffered complications during her delivery that she attributes to HESL, SOGC, and Dr. Burgos' negligence, as well as that of HESL's nursing and ancillary staff. These complications allegedly caused damages to I.M.S. in the form of multiple medical conditions, such as anoxic brain injury, cerebral palsy, microcephaly, Horne's Syndrome, delayed social and emotional development, optic atrophy, myopia of both eyes, and feeding difficulties, among others. Plaintiffs also allege that I.M.S. will not be able to live a normal life and will need continuous specialized care and assistance. Plaintiffs therefore seek

$30,000,000 in general and special damages, plus the imposition of punitive damages, under Puerto Rico law.

All appearing defendants filed answers to the amended complaint and denied liability. **ECF Nos. 35, 36, 41**. After several procedural developments and the conclusion of discovery, the parties moved for partial summary judgment in August 2024 on the matter of the RAMC Act's applicability to plaintiffs' claims. **ECF Nos. 80, 90, 93**. On March 26, 2025, the Court issued an Omnibus Opinion and Order and made certain findings of fact, but ultimately denied summary judgment for all parties. **ECF No. 184**. Recognizing that the resolution of this issue would facilitate settlement negotiations, or failing these, at least save time and resources at trial, the Court afforded defendants the opportunity to file a second or supplemental motion for summary judgment addressing two discrete questions: (i) whether Ms. Seda was treated within HESL's residency program, and (ii) whether Dr. Burgos was in the exercise of his teaching duties when he treated her. **ECF No. 184** at 28-29. Plaintiffs, however, filed a motion for reconsideration, which the Court denied on September 2, 2025. **ECF Nos. 193, 203**.

HESL then filed its supplemental motion for partial summary judgment on October 17, 2025. **ECF No. 208**. Along with their supplemental motion, defendants submitted a proposed supplemental statement of uncontested material facts ("SUMF"), **ECF No. 209**, relying principally on three documents for support: (i) Dr. Valentín's unsworn statement under penalty of perjury (**ECF No. 209-1**), (ii) portions of Ms. Seda's medical record at HESL covering the period between December 18 and 22, 2020 (**ECF No. 209-2**), and (iii) Dr. Burgos' unsworn

statement under penalty of perjury (**ECF No. 209-3**). SOGC and Dr. Burgos each filed a motion to join HESL's supplemental motion. **ECF Nos. 211, 212.**[2] SOGC asked the Court to dismiss all claims against it in the event that it found Dr. Burgos to have been in the performance of his academic or teaching duties. **ECF No. 211** at 2-3.

On November 24, 2025, after receiving two extensions of time to do so, plaintiffs made two filings. First, plaintiff moved to strike Dr. Valentín's statement as coming from a previously undisclosed witness in contravention of Fed. R. Civ. P. 26(a)(1). **ECF No. 219**. HESL filed a response in opposition to the motion to strike on December 8, 2025, **ECF No. 227**, and plaintiffs promptly filed a reply on December 15 with leave of Court, **ECF No. 229-1**. Second, on December 8, 2025, plaintiff filed a proper response to the supplemental motion for partial summary judgment, separately attaching an answer or opposition to defendants' supplemental SUMF ("OSUMF"). **ECF Nos. 220, 220-8**. On January 7, 2026, with the Court's leave, defendants filed a reply in support of their supplemental motion. **ECF No. 239**. Defendants also attached a reply to plaintiffs' OSUMF at **ECF No. 239-1**, which plaintiffs then moved to strike and for leave to file a sur-reply. **ECF No. 241**. The Court granted plaintiffs leave to file the sur-reply but denied their request to strike defendants' reply statement. **ECF No. 244**. Plaintiffs filed their sur-reply on February 9, 2026. **ECF No. 247**.

[2] Because SOGC and Dr. Burgos joined HESL's supplemental motion, the Court will consider all defendants to be moving parties.

## III. Legal Standard

Through summary judgment, courts "pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 794 (1st Cir. 1992). A court may grant summary judgment only when the pleadings and the evidence demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Sands v. Ridefilm Corp.*, 212 F.3d 657, 660 (1st Cir. 2000). A factual dispute is "genuine" if it could be resolved in favor of either party; it is "material" if it potentially affects the outcome of the case. *Murray v. Warren Pumps, LLC*, 821 F.3d 77, 83 (1st Cir. 2016); *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004). Although the court states the facts in the light most favorable to the party against whom summary judgment is sought, the court is still required "to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Adria Int'l Grp., Inc. v. Ferre Dev., Inc.*, 241 F.3d 103, 107 (1st Cir. 2001) (citation omitted).

The court must review the record "taken as a whole," and "may not make credibility determinations or weigh the evidence." *Reeves v. Anderson Plumbing Productions Inc.*, 530 U.S. 133, 135 (2000). Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are functions of a jury, not of a judge. *See id.*

It is a "bedrock principle that a party opposing summary judgment must adduce specific evidence sufficient to create a genuine issue of material fact." *Rodríguez v. Encompass Health Rehab. Hosp. of San Juan, Inc.*, 126 F.4th 773, 777 (1st Cir. 2025). Local Rule 56(c) states, in pertinent

part, that "[a] party opposing a motion for summary judgment shall submit with its opposition a separate, short, and concise statement of material facts" in which it "shall admit, deny or qualify the facts supporting the motion for summary judgment by reference to each numbered paragraph of the moving party's statement of material facts." L. Civ. R. 56(c). The opposing party may also include a "separate section [of] additional facts" which must comply with Local Rule 56(e). *Id.* Local Rule 56(e), for its part, provides that "[f]acts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted. . . . The court shall have no independent duty to search or consider any part of the record not specifically referenced by the parties' separate statement of facts." L. Civ. R. 56(e). This is known as an "anti-ferret rule," which is "intended to protect the district court from perusing through the summary judgment record in search of disputed material facts and prevent litigants from shifting that burden onto the court." *López-Hernández v. Terumo Puerto Rico LLC*, 64 F.4th 22, 26 (1st Cir. 2023). Litigants ignore the anti-ferret rule at their peril. *Rodríguez-Severino v. UTC Aerospace Sys.*, 52 F.4th 448, 458 (1st Cir. 2022). In the end, the nonmoving party is required to demonstrate "through submissions of evidentiary quality that a trial worthy issue persists." *Iverson v. City of Boston*, 452 F.3d 94, 108 (1st Cir. 2006).

## IV. Factual Findings

### A. The disputes over defendants' supplemental SUMF.

Plaintiffs admitted just eight of defendants' 115 proposed statements of fact: SUMF ¶¶ 72, 79, 84, 87, 93, 96, 99, and 101. The Court has reviewed the citations to these and found them properly supported. L. Civ. R. 56(e). ("Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted."). Plaintiffs also moved to strike Dr. Valentín's statement, which defendants use to support, in whole or in part, thirty-three of their proposed statements: SUMF ¶¶ 1-6, 23-26, 39-40, 44-49, 51-52, 59-71. The Court denied the motion, **ECF No. 251**, but plaintiffs still maintained specific objections to most of these paragraphs, *see* OSUMF ¶¶ 2-4, and, as to the rest of the proposed statements, plaintiffs either qualified or denied them, *see* SUMF ¶¶ 73-78, 80-83, 85-86, 88-92, 94-95, 97-98, 100, 102-115.

#### 1. Anti-ferret rule objections to SUMF citations.

At this threshold, the Court must address some of plaintiffs' stated grounds for denying many of the SUMF's paragraphs. First, plaintiffs point out that the SUMF jumps and omits the number "13" in its enumeration of its paragraphs. Therefore, paragraph 12 is immediately followed by paragraph 14. *See* **ECF No. 209** at 3. This does not affect the record citations in the SUMF itself, but does affect those in the supplemental motion since defendants at one point there cited to "SUMF 13" when they meant to cite SUMF ¶ 14. **ECF No. 208** at 5 n.17. This means that the rest of the subsequent citations to the SUMF paragraphs in the motion are off by one number:

for example, defendants' citation to "SUMF 14" should be to SUMF ¶ 15, the one to "SUMF 15" should be SUMF ¶ 16, and so on. Plaintiffs contend that this is a violation of the Court's anti-ferret rule. *See* L. Civ. R. 56(e) ("The court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statements of fact."). While this oversight could have easily been avoided had HESL's counsel employed a more scrupulous pre-filing review, it is not so serious to require an unforgiving application of the anti-ferret rule. The Court's review of the SUMF will allow it to situate itself when considering the supplemental motion and its citations. *Cf. Quintana-Dieppa v. Dep't of Army*, 130 F.4th 1, 12 (1st Cir. 2025) (clarifying that, notwithstanding L. Civ. R. 56(e), the Court may exercise its discretion and "consider other materials in the record" when constructing the summary judgment record).[3]

Second, plaintiffs point to certain pages of the partial medical record cited in the SUMF as not being in defendants' exhibit. *See* **ECF No. 247** at 13. But the Court has not had any difficulty finding any of the cited pages (except for one). The medical record is numbered by hand, and defendants' page citations refer to this manual enumeration—not the page number assigned by the Court's electronic filing system. For instance, "Exh. 2, p. 33" cited in SUMF ¶ 99 n.105, corresponds to **ECF No. 209-2** at 21. It is odd for plaintiffs to raise this issue on sur-reply when they seemingly had no trouble identifying these pages in their OSUMF. *See, e.g.*, **ECF No. 220-8** at 11-15 (addressing the proposed facts on which the "missing pages" rely).

[3] These "other materials" include documents filed in support of the parties' prior round of summary judgment briefing.

Third, plaintiffs at times deny a proposed fact in part because the document cited in support "does not form part of [the] second motion for partial summary judgment" and that "[t]here is no docket entry indicating whether this document forms part of the record before the Honorable Court." *See* **ECF No. 220-8** at ¶¶ 4, 8-9. These assertions refer specifically to SUMF ¶¶ 11, 75 and 76. After a review of the paragraphs of concern, the Court finds that the objection has merit as to SUMF ¶ 11, but not ¶¶ 75 or 76.

**2. Authenticity objections to web pages referenced in SUMF.**

Plaintiffs deny SUMF ¶¶ 7, 57 and 58 because these rely on unauthenticated web pages. **ECF No. 220-8** at ¶ 2. These statements purport to contextualize certain portions of the medical residency accreditation requirements and are supported by citation to materials found in a non-party organization's website, including two transcribed portions of a pdf document titled "Milestone Guidebook." Neither the website nor the document was submitted in print-out or screenshot form as exhibits to the SUMF. Neither did defendants establish how and when the websites were visited. These, moreover, are not claimed to be government publications that could be self-authenticating under Fed. R. Evid. 902(5) or subject to judicial notice under Fed. R. Evid. 201. *See, e.g., Hawkes v. BSI Fin., Inc.*, 444 F. Supp. 3d 260, 266 (D. Mass. 2020) (analyzing whether screenshot from United States Postal Service web page could be a self-authenticating "publication purporting to be issued by a public authority" in the absence of an authenticating affidavit.).

The text of Fed. R. Civ. 56(c)(2) allows an objecting party to attack "the material cited to support or dispute a fact" by asserting that the material "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). "[T]he standard is not whether the evidence at the summary judgment stage would be admissible at trial -- it is whether it could be presented at trial in an admissible form." *Est. of Rahim by Rahim v. Doe*, 51 F.4th 402, 412 (1st Cir. 2022) (quoting *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 793 (8th Cir. 2012) (alterations and emphasis in original)).[4] "[T]he material cited to support or dispute a fact must simply be reducible to an admissible form. . . . After all, to hold that a district court may not consider non-authenticated evidence at the summary judgment stage would . . . [negate] the very notion that cases may be resolved on summary judgment." *Brown v. Latin Am. Music Co.*, No. CV 24-01523 (MAJ), 2026 WL 2333695, at *2 n.3 (D.P.R. Aug. 12, 2026) (citing *Celotex Corp. v. Catrett*, 744 U.S. 317, 324 (1986); *Joseph v. Lincare, Inc.*, 989 F.3d 147, 155 n.4 (1st Cir. 2021)). "An objection to the admissibility of evidence must not be that the material has not been submitted in admissible form, but that it cannot be. The objecting party must explain why the evidence could not be presented in an admissible form at trial." *Mercado-Reyes v. City of Angels, Inc.*, 320 F. Supp. 3d 344, 348 (D.P.R. 2018) (citation modified).

[4] Despite this language, there exists some uncertainty in First Circuit case law on whether a document needs to be authenticated and/or admissible to be considered at summary judgment. *Contrast G. v. Fay School*, 931 F.3d 1, 14 (1st Cir. 2019)) ("Documents supporting or opposing summary judgment must be properly authenticated." (quoting *Carmona v. Toledo*, 215 F.3d 124, 131 (1st Cir. 2000)) *with Joseph*, 989 F.3d at 155 n.4 (recognizing tension between *Fay* and the 2010 amendments to Rule 56, Fifth and Eleventh Circuit case law rejecting authentication requirement, and Supreme Court *dicta* in *Celotex Corp.*, 744 U.S. at 324, on nonmovant's evidentiary burden under Rule 56).

Plaintiffs' reasons why these web pages should not be considered are that they are neither authenticated nor admissible as hearsay, and that they do not form part of the record before the Court. **ECF No. 220-8** at ¶ 2; **ECF No. 247** at 13-14. Plaintiffs cite in support an unreasoned footnote written by a Magistrate Judge from the Western District of Texas for the proposition that "merely providing a URL or internet link is insufficient to make the underlying evidence of record." *Hix-Hernández v. Ford Motor Co.*, No. 1:20-CV-00029-RP, 2022 WL 2902838, at *1 n.1 (W.D. Tex. June 22, 2022); *see also Money v. City of San Marcos*, 2025 WL 2658999, at *3-4 (W.D. Tex. Sept. 11, 2025) (citing *Hix-Hernández* in summary judgment context). Regardless of whether this is a proper admissibility objection under Rule 56(c)(2), and given defendants' silence in response to plaintiffs' objection, the Court is not convinced that, solely with the web page links submitted by defendants, it would be proper to consider their content at summary judgment. Defendants have not put the Court in a position to properly consider these materials.

**3. Identification of signatures in Ms. Seda's partial medical record.**

Several of plaintiffs' denials in their OSUMF center mainly on Dr. Burgos' unsworn statement under penalty of perjury, **ECF No. 209-3**, which in turn relies in large part on the portion of Ms. Seda's medical record at HESL that defendants' submitted with their SUMF, **ECF No. 209-2**. Indeed, all but one of the SUMF paragraphs that rely on Dr. Burgos' statement include parallel citations to the medical record or other documents. *See* SUMF ¶ 115 (only exception). Plaintiffs' position is that Dr. Burgos lacks sufficient knowledge to testify about the contents of the medical record given that he could not remember many facts during his deposition, that he

lacks personal knowledge of the residents' signatures, and that some of the signatures in the medical record are illegible.[5]

The material nature of the medical record is self-evident. It contains multiple contemporaneous notes, observations, and medical orders logged and signed by HESL residents and nurses and countersigned by Dr. Burgos, and it documents the treatment Ms. Seda received from her admission up to (at least) her delivery and immediate post-partum care. The presence of medical residents throughout Ms. Seda's treatment would indicate that Ms. Seda was treated within HESL's residency program and that the residents were under the supervision of Dr. Burgos, who has been established as a member of HESL's medical faculty for the relevant period. **ECF No. 184** at 9. If uncontested, these facts would favor partial summary judgment in favor of defendants, making them material for purposes of summary judgment.

The Court has found no objection in plaintiffs' briefs as to the admissibility of the medical record itself, either during the first round of summary judgment briefing or the present one.

---

[5] More generally, plaintiffs oppose the use of Dr. Burgos' statement in support of several SUMF paragraphs by making cursory and often unspecific references to their opposition to the supplemental motion for partial summary judgment. *See* OSUMF ¶¶ 6, 9-10, 13, 19, 21, 23, 25, 29, 33, 36-45 (denying, "denying as drafted," or qualifying SUMF ¶¶ 73, 76-77, 80, 91-83, 90, 92, 94, 98, 102, 104-115). Plaintiffs devoted twenty pages of their opposition solely to attacking Dr. Burgos' personal knowledge, credibility, and consistency. **ECF No. 220** at 7-27. Therefore, many of these denials and qualifications are on their face noncompliant with the anti-ferret rule, L. Civ. R. 56(e). The Court has nonetheless endeavored to match plaintiffs' arguments to the type of proposed facts they attempt to deny or qualify. In this vein, it appears that there are some contradictions between Dr. Burgos' statement and his deposition testimony, but these, even if genuine, are not material to the "teaching duties" question before the Court. An affidavit submitted in support of a motion for summary judgment under Fed. R. Civ. P. 56(c)(4) must be approached "with a scalpel, not a butcher's knife," and that requires that each segment be analyzed independently. *See Rodríguez-Rivera v. Allscripts Healthcare Sols., Inc.*, 43 F.4th 150, 170 (1st Cir. 2022) (citing *Pérez v. Volvo Car Corp.*, 247 F.3d 303, 315 (1st Cir. 2001)). There are non-conclusory statements of fact, unmolested by the highlighted contradictions and recollection problems, that are reasonably within Dr. Burgos' personal knowledge as a core faculty member of HESL. The Court will consider those it deems material to the resolution of the motion.

Indeed, plaintiffs themselves used the medical record to support their factual contentions in their prior summary judgment motion. *See* **ECF No. 93** at **4; ECF No. 163-1** (attaching medical record with partial translations); *see also* **ECF No. 188** (substituting, at plaintiffs' request, **ECF No. 93-2** for **ECF No. 163-1**). Moreover, the medical record has a custodian's certification on its front page (**ECF No. 209-2** at 1) and there is no indication that it would fail to meet the hearsay exception for a record of a regularly conducted activity. Fed. R. Evid. 803(6). The Court sees no reason to disregard the contents of the medical record for purposes of summary judgment. A medical record "is precisely the kind of impartial information that is relevant at the summary judgment stage," particularly when its contents or authenticity have not been properly challenged. *Bernard v. United States*, No. 14-1063 (CVR), 2016 WL 6833942, *4 (D.P.R. Nov. 17, 2016); *see also Renart v. Raiser, LLC*, No. CV 1:19-12349:MLW, 2023 WL 2553966, at *4 n.3 (D. Mass. Mar. 17, 2023) (rejecting admissibility challenge to medical record on the grounds that the defendants there had previously relied on it and observing that it would be "likely admissible pursuant to Rule 803(4) and/or (6) of the Federal Rules of Evidence."). Therefore, plaintiffs' attacks on the reliability of Mr. Burgos' statement—that he did not remember many facts during his deposition, that he lacks personal knowledge of the residents' signatures, that the signatures are illegible—lose force when the actual medical record can be relied upon independently.

Nevertheless, there are specific arguments underpinning plaintiffs' denials that merit discussion. For instance, plaintiffs deny SUMF ¶¶ 73-75, 81-83, 85, 88-92, 94-95, 97, 100, 102-110 and 112 because the signatures in question, as well as the signers' license numbers, are not

legible. Plaintiffs further deny these proposed statements on the theory that Dr. Burgos does not have personal knowledge of who wrote the notes that appear in Ms. Seda's medical records, particularly as it pertains to the identity of the residents who authored them.

The Court's own review of the pages of the medical record in question shows that most of the license numbers next to the signatures are easily legible. In addition, plaintiffs ignore defendants' citation to their verified answers to interrogatories and requests for production of documents, previously included in the record as an exhibit to HESL and Dr. Burgos' prior motion for partial summary judgment. *See* **ECF No. 209** at 13 n. 79 (citing **ECF No. 81-7**). There, HESL provided the license numbers of "the obstetrics and gynecology residents providing medical services to Ms. Seda" and listed the following: Arelys Flores-Vázquez R34791 ("Dr. Arelys Flores"); Andrea Colom R34931 ("Dr. Andrea Colom"); Félix R. Chico R34794 ("Dr. Chico"); María del Mar Díaz-Bonilla R34783 ("Dr. Díaz"); Bryan Hernández-Colón R34922 ("Dr. Bryan Hernández"); Lyam Colón Santos R34792 ("Dr. Colón"),[6] and Pediatric Program Resident José Colón-Cortés Lic. 21227 ("Dr. José Colón"). **ECF No. 81-7** at 19 ¶ 21. The Court, using this document, can easily match most of the signatures to their authors. *See* Fed. R. Civ. P. 56(c)(1)(A)

[6] The record shows a discrepancy between the spelling of Dr. Lyanne Colón's first name. Defendants proffered her first name as "Lyanne" in their first round of summary judgment briefing. **ECF No. 81** at 4 ¶ 15. Dr. Lyanne Colón's contract with HESL has that spelling. *See* **ECF No. 81-8**. For their part, plaintiffs raised no objection, **ECF No. 118-1** at 14 ¶ 32, and so the Court deemed it admitted, **ECF No. 184** at 9. But in their answers to interrogatories and requests for document production, defendants used both "Lyanne" and "Lyam" to refer to Dr. Lyanne Colón. *Compare* **ECF No. 81-7** at 17 ¶ 2 *with id.*, at 19 ¶¶ 21, 26. Further, Dr. Burgos refers to Dr. Lyanne Colón as "Lyann" in his statement under penalty of perjury. **ECF No. 209-3** at 2 ¶ 7. Because these are almost surely misspellings of the same name, the Court will treat references to "Lyam" or "Lyann" as referring to "Lyanne."

(permitting a party's use of "documents, . . . interrogatory answers, or other materials" in the record to support an assertion of undisputed fact).

Regarding the signature and license number referenced in SUMF ¶¶ 85-86, defendants maintain that they belong to Dr. Chico notwithstanding the license number being partly illegible. However, defendants submitted Dr. Chico's employment contract with HESL in support of their previous motion for summary judgment, where Dr. Chico's signature, found at the margins of every page in the contract, can be compared and matched to the one in the page referred to in SUMF ¶ 85 (and others). *Compare* **ECF No. 81-9** *with* **ECF No. 209-2** at 10-11. The only completely illegible signatures and/or license numbers are those not belonging to Dr. Burgos that are referenced in SUMF ¶¶ 91 and 92, which refer to post-partum treatment notes. Therefore, even if the Court were to credit plaintiffs' arguments on Dr. Burgos' lack of personal knowledge, it need not rely on him for the identity the residents' signatures in the medical record. The medical record, relied upon by both sides in this case, speaks for itself.

Plaintiffs also insinuate that Dr. Burgos' countersignature in many of the notes found in the medical record could have been added "days, weeks, months or even years" after the fact and does not establish that he was teaching any residents at the time. **ECF No. 220** at 22-25. This is supported by Dr. Burgos' failure to recollect when he countersigned the record in his deposition. There, Dr. Burgos testified that "what we usually do [is that] [b]ecause the resident makes the physical exam, the history, . . . before the patient is discharged, he makes sure that the file is completely signed by the physician. . . . That's what we usually do before the patient

is discharged, then we sign it." **ECF No. 220-2** at 134:13-20. This, however, is proper evidence of habit or routine practice that does not require independent corroboration. *See* Fed. R. Evid. 406. The absence of a time stamp or Dr. Burgos' exact recollection of the dates of signature does not, by itself, genuinely contest the circumstances under which Dr. Burgos countersigned the medical record.

**4. Reliance on document that cannot be presented in a non-hearsay form.**

Many of defendants' initial SUMF paragraphs purporting to detail the structure and purposes of HESL's residency programs rely on citations to a document titled "ACGME Common Program Requirements (Residency)" filed in support of HESL and Dr. Burgos' first motion for partial summary judgment. *See* **ECF No. 81-16**. Defendants use this document to summarize via paraphrasis several of its pages and sections on what appear to be the detailed accreditation requirements applicable to teaching hospitals. *See*, *e.g.*, SUMF ¶¶ 33-35. Plaintiffs object to the SUMF paragraphs that rely on this document because, among other things, defendants have not explained how it could be authenticated, Fed. R. Evid. 901, and because it is inadmissible hearsay, Fed. R. Evid. 801, 802. **ECF No. 220-8** at ¶ 3.

Although plaintiffs had previously admitted a proposed statement of fact that relied on this same document, *compare* **ECF No. 81** at ¶ 9 *with* **ECF No. 118-1** at ¶ 32, and did not then raise any authenticity or hearsay objection as to it, the Court's review of the document and the defendants' briefs proves plaintiffs partially correct in this objection. As to authenticity, the document has distinctive characteristics, including corporate logos, copyright marks, and a date

of revision which could fulfill the authentication requirement under Fed. R. Evid. 901(4). In addition, Dr. Valentín could be a witness with sufficient knowledge of the document to authenticate it under Fed. R. Evid. 901(b)(1), as she is the Director of HESL's Graduate Medical Education Program, and her duties, among others, include "assisting HESL and the Program Directors for the Hospital's eight (8) residency programs to maintain and support the various residency programs; and to ensure compliance with the American Council of Graduate Medical Education's [("ACGME")] rules and regulations for said programs." SUMF ¶¶ 1-4. But that is as far as it goes. The contents of the document in question are hearsay because they are out-of-court statements brought to prove the truth of the matter asserted. Fed. R. Evid. 801(a)-(c). Defendants have not proffered any reason, and the Court cannot discern any apparent one from the record, to hold that the document can be presented in a non-hearsay form or that an exception to the exclusionary rule would apply to the document. *See* Fed. R. Evid. 801(d), 803, 804. Accordingly, the Court will not consider the proposed facts in the SUMF that rely exclusively on this document.[7]

**B. The uncontested material facts.**

Having addressed the matters above, the Court proceeds to draw the factual findings from the parties' admissions on the record and those statements of proposed facts that comply with L. Civ. R. 56. *See CMI Capital Market Inv. v. González-Toro*, 520 F.3d 58, 62 (1st Cir. 2008).

---

[7] Given her position, duties, and personal knowledge of HESL residency programs and the ACGME accreditation criteria, Dr. Valentín can independently establish some of the proposed facts that depend on the hearsay document. Indeed, some SUMF citations to **ECF No. 81-16** are adequately supported by Dr. Valentín's statement.

Although the Court reviewed every proposed fact properly submitted by the parties, it will only consider and include below those that are material and uncontested for purposes of defendants' supplemental motion for partial summary judgment. Any proposed fact not included below is to have been deemed either immaterial or contested. For ease of reference, the Court will first incorporate the relevant prior findings of fact it made in its Omnibus Opinion and Order of March 26, 2025. **ECF No. 184**.

**1. Prior findings of uncontested material facts.**

Since June 9, 2008, the Regional Academic Medical Center for Southwest Puerto Rico, an independent nonprofit entity created pursuant to the RAMC Act, has recognized HESL as a "Main Health Service Institution" affiliated with the Ponce School of Medicine. **ECF No. 184** at 7. On April 17, 2012, HESL and the Ponce School of Medicine executed an affiliation agreement ("2012 Affiliation Agreement"), whereby they "agreed to form an Educational Consortium to assist and support each other in providing educational experiences and teaching sites for medical students and physicians in training also known as medical residents." *Id.*, at 8. The 2012 Affiliation Agreement had no concrete expiration term and could only be modified by a subsequent written agreement between the parties. *Id.*

In May of 2020, HESL and the Ponce School of Medicine executed another affiliation agreement titled "Clinical Training Affiliation Agreement" ("2020 Affiliation Agreement"). *Id.* Like the 2012 Affiliation Agreement, this one also created an Educational Consortium to help "provide educational experiences and teaching sites for medical students and physicians in

training also known as medical residents." *Id.* The 2020 Affiliation Agreement recognized that "the hospital, the medical school and participating physicians with academic appointments in the [Ponce School of Medicine] will receive the benefits of medical malpractice caps in all medical malpractice cases that arise under the terms of the Law 136, as amended." *Id.*

Dr. Burgos and HESL executed a Medical Teaching Contract on July 1, 2020, for him to provide teaching services as a core faculty member in HESL's Obstetrics and Gynecology Residency Program, through the educational consortium formed with the Ponce School of Medicine. *Id.*, at 8-9. SOGC did not appear as a party to that contract. *Id.*, at 9. This Medical Teaching Contract was in effect from July 1, 2020, to June 30, 2021. *Id.*

Dr. Burgos and the Ponce School of Medicine executed a Contracted Services Agreement dated November 17, 2020, which by its terms was in effect from July 1, 2020, to June 30, 2021. *Id.*, at 9. Pursuant to the agreement, Dr. Burgos was contracted as a faculty instructor to provide the following services: "OB-Gyn Department, Provide clinical opportunities for medical students to develop basic obstetrical and gynecology skills, both outpatient and inpatient activities. (San Lucas Hospital/Private Office) Provide lecture to 3rd year medical students." *Id.*

During the time period between December 18 and 20, 2020, Dr. Lyanne Colón-Santos and Dr. Félix Chico-García were resident physicians receiving training in HESL's Residency Program in Obstetrics and Gynecology. *Id.* at 9. Both had executed contracts with the Puerto Rico Department of Health to render services as Resident Physicians in HESL's Obstetrics and Gynecology program. *Id.*

SOGC is a domestic, for-profit, professional services corporation incorporated effective July 19, 2011. *Id.*, at 9. Its purpose, as it appears in the Puerto Rico Department of State's Online Corporation Registry, is "[t]o provide professional services related to the practice of medicine, particularly the specialty of Obstetrics and Gynecology, including related ancillary services." *Id.*, at 9-10. Dr. Burgos is SOGC's incorporator, resident agent, president, and treasurer, and is also the person in charge of its organization and administration of wealth. *Id.*, at 10.

On May 7, 2020, Ms. Seda became a patient of Dr. Burgos and SOGC. *Id.* She went to around ten or eleven prenatal visits at Dr. Burgos' office. *Id.* Dr. Burgos was the doctor who attended her during those visits. *Id.* On December 11, 2020, Ms. Seda went to SOGC for a prenatal visit and was told that she was due to give birth on December 15, 2020. *Id.* Ms. Seda was admitted to HESL's Labor and Delivery Department on December 18, 2020, for the delivery of her infant son. *Id.* Dr. Burgos provided treatment and care to Ms. Seda at HESL from December 18 through December 20, 2020, as he was the obstetrician in charge of the delivery. *Id.* In addition to Dr. Burgos, Ms. Seda was treated from December 18 through December 20, 2020, by Dr. Colón and Dr. Chico. *Id.* The "Physician's Delivery Note" from HESL's medical record on Ms. Seda indicates that the delivery was performed by Dr. Burgos, Dr. Chico, and Dr. Colón. *Id.* Nurse Keila Torres, an obstetrical nurse, provided nursing care to Ms. Seda at HESL's Labor and Delivery Ward on December 19 and 20, 2020, assisting Dr. Burgos and the resident physicians. *Id.* She carried out medical orders entered by the doctors during the delivery. *Id.*, at

11. The nurses at HESL's labor and delivery ward are employed by HESL. *Id.*, at 11. On December 20, 2020, Ms. Seda gave birth to I.M.S. at HESL. *Id.*

**2. HESL's Residency Programs.**

HESL has eight residency programs and a fellowship program, including its Obstetrics and Gynecology Residency Program. SUMF ¶¶ 5, 23. All of them are accredited by ACGME, the entity designated to oversee the accreditation of residency and fellowship programs in the United States. SUMF ¶¶ 6, 8. HESL provides graduate medical training to its 136 residents and fellows, and hosts medical students from all accredited medical schools in Puerto Rico, as well as several international institutions. **ECF No. 209-1** at ¶¶ 9-10. As a teaching hospital, HESL serves the dual mission of being an institution of patient care and of participating in academic training. **ECF No. 209-1** at ¶ 11.

Teaching hospitals integrate clinical service with graduate medical education to transform newly graduated physicians into independent and competent specialists. **ECF No. 209-1** at ¶ 12. Graduate medical education often lasts from three to seven years, depending on the specialty at issue. **ECF No. 209-1** at ¶ 15. Residents learn medicine not only from their supervising faculty but also from the daily interactions they have with the broader healthcare team. **ECF No. 209-1** at ¶ 18. For instance, nurses teach them the value of vigilance, patient advocacy, and the importance of clear communication. SUMF ¶ 47. Ancillary departments, such as laboratory, pharmacy, radiology, rehabilitation, and social work, expose residents to the interdependent systems of care that make modern medicine possible. SUMF ¶ 48. And

administrative staff and hospital leadership model the operational and ethical responsibilities that physicians must understand to serve effectively within complex health systems. SUMF ¶ 49.

The clinical learning environment that is part of ACGME's institutional requirements encompasses the following six areas: patient care, medical knowledge, practice-based learning and improvement, system-based practice, professionalism, and interpersonal skills communication. **ECF No. 209-1** at ¶ 22. This structure aims for every encounter, department, and team member to play a role in shaping the residents' knowledge, skills, and professional values. SUMF ¶ 51. By experiencing the hospital as a complete unit, residents come to appreciate that safe, high-quality care is always the product of collaboration. SUMF ¶ 52.

HESL's residency programs are structured as follows: HESL is the sponsoring institution affiliated to Ponce Health Science University School of Medicine (who is the academic sponsor), and is part of the Regional Academic Medical Center of the Southwest established in the RAMC Act, which, as required by the ACGME, provides the various residency programs. SUMF ¶ 59. HESL is responsible for providing the following to all its residency programs: faculty; areas for each residency; area for classes; a program coordinator for each residency category; conference rooms; meals; equipment; specialized attire (scrubs, masks, gloves, etc.); and all materials required by the residents to work with the patients. SUMF ¶ 60. HESL also provides all ancillary services, such as radiology, respiratory therapy, and nursing, among others, as well as activities for education, conferences, and symposiums. SUMF ¶ 61.

As it relates to HESL's Obstetrics and Gynecology Residency Program, the same received its initial accreditation from the ACGME on July 1, 2002, and it maintained continuous ACGME accreditation though its most recent program accreditation, which was on April 4, 2025. SUMF ¶ 62. The Obstetrics and Gynecology Residency Program is one of only three such ACGME-accredited programs in all of Puerto Rico. SUMF ¶ 63. Because of this, all obstetricians/gynecologists that have privileges conferred by HESL to treat their patients at its hospital are part of the faculty that teach and train medical students and residents. SUMF ¶ 64. This ensures that the participating residents comply with the ACGME's mandated requirements in terms of hours, number, and types of procedures and/or deliveries for each year/level of their residency. SUMF ¶ 65. This also means that all the patients that come to HESL for an obstetric or gynecological procedure enter the teaching stream and receive treatment by residents of all levels, together with their supervising/attending physician. SUMF ¶ 66. Accordingly, the residents who participate in each and every obstetric or gynecological procedure undertaken at HESL do so within the teaching stream, and the attending physician does so as part of his or her teaching duties, all to ensure that ACGME's requirements are met by each resident. SUMF ¶ 67.

Designated "core faculty" members such as Dr. Burgos play a significant role in the education and supervision of obstetrics and gynecology residents, must devote a significant portion of their entire effort to resident education and/or administration, and must, as a component of their activities, teach, evaluate, and provide formative training to residents. SUMF ¶ 69. In the case of "core faculty" like Dr. Burgos, his contract establishes the minimum time

that must be devoted to non-clinical and administrative work in relation to the residency program and includes tasks as follows: regular teaching and evaluation of residents; providing formative feedback; participating in curriculum design and program evaluation; completing the annual ACGME faculty survey; and serving on required program committees. SUMF ¶ 70; **ECF No. 209-3** at ¶ 3; **ECF No. 81-3** (cert. trans. at **ECF No. 109-2**). The minimum established time for the non-clinical tasks performed by core faculty is separate and distinct from the clinical duties undertaken by said faculty members. SUMF ¶ 71; **ECF No. 209-3** at ¶ 4.

### 3. Ms. Seda's treatment at HESL by Dr. Burgos and residents.

During Ms. Seda's stay at HESL, Dr. Burgos was assisted in several aspects of her labor, delivery, and post-partum care by various residents at different levels of training from HESL's Obstetrics and Gynecology Residency Program. **ECF No. 209-3** at ¶ 5. The medical record establishes, through contemporaneous statements contained within and through signatures identifiable by their corresponding resident license number, provided in HESL's verified answers to interrogatories and requests for document production (**ECF No. 81-7** at 19 ¶ 21), that Dr. Burgos and several HESL residents treated Ms. Seda at different times from December 18 to December 20, 2020.

#### a. December 18, 2020.

An "Outpatient Department Note" in Ms. Seda's medical record, dated on December 18, 2020, at 9:00am, documents Ms. Seda's chief complaint when she presented to HESL to be: "I came due to painful contractions since 3am." SUMF ¶ 72. The note documents Ms. Seda's intake

process and physical examination and is signed by Dr. Arelys Flores, Lic. No. 34791R, and Dr. Bryan Hernández, Lic. No. 34922R, and is countersigned by Dr. Burgos. SUMF ¶ 73; **ECF No. 81-7** at 19 ¶ 21. An "Obstetrical Record and Admission Note" from the same time and date corresponds to Ms. Seda's admission to the delivery room and documents information obtained from Ms. Seda at the time of admission. SUMF ¶ 74; **ECF No. 209-2** at 6. This note contains Dr. Andrea Colom's signature and is countersigned by Dr. Burgos. SUMF ¶ 76; *compare* **ECF No. 209-2** at 6 *with* **ECF No. 209-2** at 21 (containing same signature alongside the identifying number "34931R" which is ascribed to Dr. Andrea Colom (**ECF No. 81-7** at 19 ¶ 21)). This note also contains a chart containing a summary of Ms. Seda's ante-partum examinations performed at various time intervals from the morning of December 18 to the night of December 19. SUMF ¶ 75. At the bottom of the page, the initials "AF," "RB," and "AC" are written in the row identifying the "Examiner." **ECF No. 209-2** at 6. The initials "AF" and "RB" appear below four examinations conducted on December 18, 2020. *Id.* These initials correspond to Dr. Arelys Flores, Lic. No. 34791R, and Dr. Burgos. SUMF ¶ 75; **ECF No. 209-3** at ¶ 14.

In addition, an "Obstetrics and Gynecology Ultrasound Report" dated December 18, 2020, at 3:00pm, documents the findings of an ultrasound performed on Ms. Seda, including ultrasound fetal age, estimated fetal weight, amniotic fluid volume, and placenta location. SUMF at ¶ 93. The same is signed by Dr. Bryan Hernández, Lic. No. 34922R, and is countersigned by Dr. Burgos. SUMF ¶ 94; **ECF No. 81-7** at 19 ¶ 21. Also, an "Informed Consent

for Labor Induction" form dated December 18, 2020, appears signed by Ms. Seda and by Dr. Arelys Flores, 34791R. SUMF ¶ 95.

The "Physician's Orders" sheet page hand-numbered "29" documents the various medical orders entered on December 18, 2020, from 9:55am to 9:20pm. SUMF ¶ 96; **ECF No. 209-2** at 19. It shows orders signed by Dr. Colón, Lic. No. 34792R, and Dr. Arelys Flores, Lic. No. 34791R. SUMF ¶ 97; **ECF No. 81-7** at 19 ¶ 21. Likewise, the "Nurse's Notes" sheet page hand-numbered "82" reflects that Dr. Burgos was notified of Ms. Seda's arrival at HESL at 9:00am and that he ordered a pelvic examination; it also documents that it was performed and that he was informed of the results at 9:50am. SUMF ¶ 104; **ECF No. 209-2** at 23; **ECF No. 223-1** at 23 (cert. trans.).[8] The next page of the sheet, hand-numbered "83," reflects that at 12:45pm, Dr. Bryan Hernández performed a pelvic examination. SUMF ¶ 105; **ECF No. 209-2** at 24; **ECF No. 223-1** at 24.[9] The third page of the "Nurse's Notes" sheet, hand-numbered "85," reflects that Dr. Arelys Flores spoke with Ms. Seda and gave treatment orders at 8:25pm and 9:20pm. SUMF ¶ 106; **ECF No. 163-1** at 122, 140.[10]

---

[8] This matches the time and date of the first ante-partum examination performed by "AF" that appears in chart at the bottom of the "Obstetrical and Admission Note." **ECF No. 209-2** at 6.

[9] Although the note names "Dr. Hernández OBR1," it stands to reason that this is the same Dr. Bryan Hernández, Lic. No. 34922R, that attended Ms. Seda that day, as evidenced by his signature in the ultrasound report and in the outpatient department note dated on the same day.

[10] The cited page is missing from the partial medical record submitted with the SUMF. However, plaintiffs supplied the omitted page and a translation as part of their prior opposition to defendants' first motion for partial summary judgment. **ECF No. 163-1** at 122, 140. At pages 121 (original) and 139 (translation) of the document, there is a "Nurse's Note" that documents two visits by Dr. Burgos in the evening of December 18, 2020: a 6:00pm visit where he talked to Ms. Seda, performed a pelvic examination, and examined tracings, and a second visit at 8:00pm, just twenty-five minutes before Dr. Arelys Flores' documented visit.

**b. December 19, 2020.**

The "Obstetrical and Admission Note" documenting Ms. Seda's ante-partum examinations, **ECF No. 209-2** at 6, reflects that the initials "AC" appear below four examinations conducted on December 19, 2020, at 11:00am, 2:40pm, 5:00pm, and 7:30pm. *Id.* These initials correspond to Dr. Andrea Colom, Lic. No. 34931R. SUMF ¶ 75.

A filled out "History and Physical" form dated December 19, 2020, at 7:00am, documents an all-systems evaluation and pelvic examination of Ms. Seda, and is signed by Dr. Arelys Flores, Lic. No. 34791R, and countersigned by Dr. Burgos. SUMF ¶¶ 77-78, 80. A "Progress Note" filled out at 8:00am is signed by Dr. Andrea Colom, Lic No. 34931R, as well as countersigned by Dr. Burgos. SUMF ¶¶ 81-83; **ECF No. 209-2**.

The "Physician's Orders" sheet pages hand-numbered "30" and "34" document the various medical orders entered on December 19, 2020, from 6:20am to 11:24pm. SUMF ¶¶ 96, 101; **ECF No. 209-2** at 20, 22. They show orders signed by Dr. Arelys Flores, Lic. No. 34791R, and Dr. Andrea Colom, Lic. No. 34931R, and Dr. Burgos' countersignature under each of them. SUMF ¶¶ 97, 101-102; **ECF No. 81-7** at 19 ¶ 21. These orders reflect the administration of Pitocin and other medications, such as acetaminophen and morphine. SUMF ¶ 101. The "Nurse's Notes" sheet pages hand-numbered "90" and "92" document an evaluation of Ms. Seda at 5:00pm, noting a 7cm dilation and rupture of membranes, and a pelvic examination at 11:40pm,

both performed by Dr. Andrea Colom. SUMF ¶ 107-109.[11] At the latter examination, the document notes Ms. Seda's request for a cesarean or c-section, which was transmitted to Dr. Andrea Colom, who then is noted as having notified Dr. Burgos. *Id.*, ¶ 108. The document then states, "[n]o orders at this time." **ECF No. 209-2** at 26; **ECF No. 223-1** at 26.

**c. December 20, 2020.**

The "Nurse's Notes" sheet page hand-numbered "94" includes an entry dated December 20, 2020, at 5:00am, which documents that a "relative" of Ms. Seda was upset, that Dr. Andrea Colom was notified, that she then notified Dr. Burgos, and oxytocin administration was ordered to stop. SUMF ¶ 110. That same page reflects that at 6:00am, Dr. Burgos was with Ms. Seda and reported full dilation. **ECF No. 209-2** at 27; **ECF No. 223-1** at 27 (cert. trans.). The next page of the "Nurses' Note" sheet, hand-numbered "95," reflects that at 6:39am, "Dr. Burgos, residents, and family members" were present as Ms. Seda was transferred to the delivery room. SUMF ¶ 111; **ECF No. 209-2** at 28; **ECF No. 223-1** at 28 (cert. trans.).

An "Intrapartum Phase" or "Intra Delivery Phase" note, hand numbered as pages "99" and "99a," documents Ms. Seda's delivery, starting at 6:39 am. SUMF ¶ 112; **ECF No. 209-2** at 29-30; **ECF No. 163-1** at 173-174 (cert. trans.).[12] Among other things, it reflects that the delivery

---

[11] In addition, the "Nurse's Notes" pages hand-numbered "86," "87," and "89"—which were not submitted by defendants but are on the record attached to plaintiffs' prior motion for summary judgment—document Ms. Seda's treatment from 1:00am to 2:45pm on December 19, and show that prior to Dr. Andrea Colom's examination, Dr. Burgos twice visited her to perform pelvic examinations, at 6:00am and 11:00am. **ECF No. 163-1** at 123-125, 141-143.

[12] Defendants submitted a certified translation of these two pages. **ECF No. 223-1** at 29-30. For the most part, the translation is genuine gibberish with non-Latin characters covering all but the last half of the second page. The

was "assisted by Dr. Burgos and/or Dr. Chico (OBR2)," that a vacuum was applied by Dr. Burgos, that a "resident doctor" took the baby's measurements, that Dr. Chico performed the episiotomy and sutured a second-degree laceration, and that Dr. Chico performed a uterine neck check-up, deep massage, and cavity cleansing with sponge. *Id.* The document is signed by two people, one of which is nurse Keila M. Torres Feliciano, Lic. No. BSN36545. **ECF No. 209-2** at 30; **ECF No. 163-1** at 174.

A "Physician's Delivery Note" dated December 20, 2020, at 8:00 am, documents the baby's birth as having taken place at 7:08am, and classified the delivery as a "Vacuum Operative Delivery." SUMF ¶ 84**; ECF No. 209-2** at 10. The note includes information as to the baby's term, sex, weight, measurements, condition at birth, and APGAR scores, as well as details on the placenta's delivery, the episiotomy performed, the presence of a second-degree perineal laceration, and the condition of the baby and mother when the doctors left the delivery room. *Id.* It further documents that that the delivery was done by "Dr. Burgos; Dr. Chico (PGY-2); Dr. Colón (PGY)." SUMF ¶ 85; **ECF No. 209-2** at 10.[13] The note is signed by Dr. Chico and

---

Court has thus used plaintiffs' legible translation of those pages, which is already on the docket. Nonetheless, this and other mistakes reflect defendants' counsel's worrying lack of attention to the manner in which they submitted their supporting materials, particularly so when they had an extra four months to prepare their supplemental summary judgment motion due to the pendency of plaintiffs' motion for reconsideration (*see* **ECF No. 198** (holding filing deadline in suspense)), and after having been granted an additional month to file so that they could "set forth in a comprehensive manner, all case evidence . . . ." (**ECF No. 204** at 2).

[13] It is unclear from the medical record whether the reference to "Dr. Colón" refers to Dr. Lyanne Colón or to Dr. José Colón. A "Dr. Colón" appears listed as the pediatrician present during the delivery in the "Intrapartum Phase" or "Intra Delivery Phase" note. **ECF No. 209-2** at 29-30; **ECF No. 163-1** at 173-174 (cert. trans.). The Court surmises that this may refer to Dr. José Colón, as he is listed as being a pediatric program resident. *See* **ECF No. 81-7** at 19 ¶ 21. However, Dr. Chico's signed "Physician Delivery Note," dated December 20 at 8:00am, refers to a "Dra. Colón

countersigned by Dr. Burgos. SUMF ¶ 86; *see ante*, sec. IV.B.3 (identifying Dr. Chico's signature). An "Obstetrics and Gynecology – On Duty Note" dated December 20, 2020, at 7:10am, documents a second-degree laceration after placenta expulsion that was repaired, and explains how this repair was carried out after the delivery. SUMF ¶ 87. The note is signed by Dr. Chico and countersigned by Dr. Burgos. SUMF ¶ 88; *see* **ECF No. 209-2** at 10 (containing same signature). Another note dated December 20, 2020, at 8:00am, provides instructions for transfer, administration of medications, taking of vital signs, ambulation, laboratory tests to be performed and the instruction to "[n]otify MD resident if any complication." SUMF at ¶ 99. This note is signed by Dr. Andrea Colom, Lic. No. 34931R. SUMF ¶ 100; **ECF No. 209-2** at 21.

## V. Discussion

In accordance with the Court's Omnibus Opinion and Order, the two outstanding questions that must be answered with the supplemental findings of fact made above are whether Ms. Seda was treated within HESL's residency program and whether Dr. Burgos was in the exercise of his teaching duties when he treated her. **ECF No. 184** at 29. The Court assumes the parties' familiarity with the legal exegesis on the RAMC Act and its interpretative case law included in the Court's Omnibus Opinion and Order. *Id.*, at 12-25. That analysis is incorporated here by reference. However, there is one other open question that was posed in the previous round of summary judgment briefing that should be answered before delving into the facts:

---

(PYG)" participating in the delivery, which, given that "Dra." is short for *doctora*, refers to a female doctor—Dr. Lyanne Colón. In any case, both Dr. Lyanne Colón and Dr. José Colón are residents, and it makes little difference for present purposes if both or only one of them was present during Ms. Seda's delivery procedure.

whether the application of the RAMC Act's liability caps is dependent on the patient's consent to being treated within a teaching hospital's "teaching stream."

### A. Whether a patient's consent to enter the teaching stream is required to apply the RAMC Act's liability caps.

In its Omnibus Opinion and Order, the Court advised that "whether Ms. Seda consented or whether the consent is even required to apply the RAMC Act's liability caps are questions that remain open and that the parties should address." **ECF No. 184** at 22 n.10; *see also* **ECF No. 203** at 8 (". . .the Court provided its understanding of the applicable law as applied to the genuine factual dispute before it [*i.e.*, Ms. Seda's consent], giving **both** parties guidance as to future briefing of this issue."). The Court's admonition responded to plaintiffs' position that Ms. Seda never validly consented to being treated within HESL's residency program.

The parties' supplemental summary judgment briefs, however, are bereft of any on-point discussion by either side on whether a patient's consent is required for the RAMC Act's liability caps to apply. Defendants ignore the issue completely, and plaintiffs' only mention comes in sur-reply and as a cursory recall to its prior arguments. *See* **ECF No. 247** at 8. Nevertheless, a recent decision by a sister court in this District persuades the Court that the issue of Ms. Seda's consent is not material to the determination of whether the RAMC Act's liability caps apply to HESL.

Plaintiffs' consent argument presumes that Puerto Rico law on informed consent claims, which are separate from medical malpractice claims involving errors of judgment or treatment,

extends to a person's decision to be treated within a teaching hospital's residency program, and that a lack of consent precludes malpractice defendants from having recourse to the RAMC Act's liability caps. *See, generally*, *Mercado-Velilla v. Asociación Hosp. del Maestro*, 902 F. Supp. 2d 217 (D.P.R. 2012) (summarizing law on informed consent claims). To justify this extension, plaintiffs cite *Rodríguez-Cedeño v. Sur Med Medical Center*, 977 F. Supp. 2d 115 (D.P.R. 2013), *Ortiz-Santiago v. Hospital Episcopal San Lucas, Inc.*, Civ. No. 16-1099 (ADC), 2018 WL 4007086 (D.P.R. Aug. 20, 2018), and *Pérez-Pérez v. Hosp. Episcopal San Lucas, Inc.*, No. CV 18-1014 (JAG-MDM), 2022 WL 18278478 (D.P.R. Aug. 16, 2022), *vacated and remanded*, 113 F.4th 1 (1st Cir. 2024). In all three cases, plaintiffs argue, the district courts made affirmative findings that the patient had signed a consent form to conclude that he or she had entered the hospital's "teaching stream." **ECF No. 93** at 13-15. Nonetheless, these decisions did not address whether the patient's consent was a pre-requisite for the application of the liability caps; at most, they proceeded under the untested assumption that it was.

This assumption is untenable under the RAMC Act. In *Romero-Comas v. Hosp. Español Auxilio Mutuo de Puerto Rico, Inc.*, No. CV 25-1189 (FAB), 2026 WL 2676592 (D.P.R. Sept. 11, 2026), it was recently held that Section 7 of the RAMC Act contains no explicit or implicit patient consent requirement, that the structure and scheme of the statute evinces no such legislative intent, and that it would be improper for the Court to read these requirements into the law. 2026 WL 2676592, at *3-5. The Court finds its sister court's analysis on this issue highly persuasive. The RAMC Act follows the clearly stated public purpose of providing Puerto Rico with

institutions that can serve as centers of learning and training for the medical professional class. *See* **ECF No. 81-15** at 1-6. The extension of the liability caps in Section 7 to the RAMCs and their medical faculty for procedures performed within their academic and teaching duties furthers this purpose. On the other hand, nullifying this legislatively mandated protection on account of an unwritten pre-requisite does the opposite. For this reason, the Court concludes that the question of whether Ms. Seda gave her informed consent to be treated within HESL's teaching program is not material to the application of the RAMC Act's liability caps.

**B. The uncontested material facts reflect that Ms. Seda was treated within HESL's Obstetrics and Gynecology Residency Program.**

Having cleared up the above and with the benefit of the additional materials supplied by the parties, the Court can now proceed to analyze the undisputed material facts in light of the statute.

To recap, Section 7 of the RAMC Act extends a liability cap to RAMCs and their medical faculty "for the medical procedures performed at said Centers in the exercise of their academic and teaching duties." P.R. Laws Ann. t. 24, § 10035. "Said limitation establishes a maximum of $75,000 for damages suffered by a person and up to $150,000 when the damages were suffered by more than one person or when there are several causes of action to which a single injured party is entitled." *Id.* In the Omnibus Opinion and Order, the Court found that it is undisputed that "at all relevant times, (i) HESL was a RAMC or part of a RAMC, (ii) Dr. Burgos was a core faculty member, and (iii) Dr. Colón and Dr. Chico were resident physicians in HESL's Obstetrics

and Gynecology Department who assisted Dr. Burgos in treating Ms. Seda." **ECF No. 184** at 18. After examining the materials on record at that point, the Court concluded that evidence of Dr. Burgos' faculty appointment and of the presence of Dr. Chico and Dr. Colón in Ms. Seda's delivery procedure, standing alone, were insufficient to hold that Ms. Seda was treated pursuant to HESL and Dr. Burgos' teaching duties. *Id.*, at 18-22.

The Court can now supplement this conclusion. First, the undisputed facts establish that HESL's Obstetrics and Gynecology Residency Program is structured in a way that all such procedures undertaken at HESL's are done within the hospital's "teaching stream." As a teaching hospital, HESL residency programs integrate graduate medical education and a clinical learning environment to allow residents to learn from the medical faculty and to interact with nurses, administrative staff, and ancillary hospital departments. This is part of ACGME's accreditation requirements. The Obstetrics and Gynecology Residency Program is designed to allow HESL residents to comply with their ACGME-mandated requirements in terms of hours, number, and types of procedures and/or deliveries performed for each year or level of their residency. HESL's Obstetrics and Gynecology Residency Program is only one of three such ACGME-accredited residencies in Puerto Rico, which presents a scarcity problem in terms of patients and procedures available for residents to treat and thus comply with their educational requirements. For that reason, all gynecological and obstetric procedures performed at HESL involve the participation of residents and their supervising or attending physicians. In

furtherance of meeting ACGME standards, HESL requires all obstetricians or gynecologists with privileges at HESL to be part of its medical faculty.

Second, the undisputed facts show that Ms. Seda was treated by HESL residents from the time she arrived at the hospital in the morning of December 18 to (at least) right after her delivery procedure on the morning of December 20, 2020. Throughout December 18, resident physicians Arelys Flores, Andrea Colom, Bryan Hernández, and Lyanne Colón all attended Ms. Seda at one point or another. The "Physician's Orders" sheet reflects several treatment orders signed by Dr. Arelys Flores and Dr. Colón. The "Nurse's Notes" sheet shows that Dr. Burgos was notified of Ms. Seda's arrival at the hospital early in the morning and that he ordered a pelvic examination. It further shows that Dr. Arelys Flores performed the examination at 9:00am and that Dr. Burgos was informed of the results at 9:50am. The document also shows that Dr. Burgos visited Ms. Seda and performed another pelvic examination at 6:00pm, that he returned at approximately 8:00pm, and that Dr. Arelys Flores visited Ms. Seda just twenty-five minutes later. An "Informed Consent for Labor Induction" form signed by Ms. Seda that day is countersigned by Dr. Arelys Flores.

Throughout December 19 and in the early morning of December 20, Dr. Burgos and Dr. Andrea Colom continued to treat Ms. Seda. During the course of the day, Dr. Andrea Colom attended to Ms. Seda in communication with Dr. Burgos, performing at least five pelvic examinations. She is also documented as having notified Dr. Burgos of Ms. Seda's request for a cesarean or c-section at 11:40pm and later at 5:00 in the morning of December 20, alongside an

order to stop the administration of oxytocin. Dr. Burgos was present at Ms. Seda's hospital bed at 6:00am and at 6:39am as per the Nurse's Notes, which also show that Dr. Burgos and residents accompanied Ms. Seda to the delivery room. The "Intrapartum Phase" or "Intra Delivery Phase" note reflects that at least one resident, Dr. Chico, was present and that he assisted Dr. Burgos in the delivery. It also reflects that Dr. Chico performed the episiotomy, sutured Ms. Seda's second-degree vaginal laceration, and performed a uterine neck check-up, deep massage, and cavity cleansing. Dr. Chico signed the "Physician's Delivery Note" dated December 20 at 8:00am, summarizing the delivery and stating that it was done by Dr. Burgos, himself, and Dr. Colón, and he signed the "Obstetrics and Gynecology – On Duty Note" documenting the second-degree laceration, dated December 20 at 7:10am.[14]

Finally, the undisputed facts also show that Dr. Burgos attended Ms. Seda at various times from December 18 to 20, 2020, in conjunction with HESL residents. As detailed above, Dr. Burgos was kept informed of Ms. Seda's condition by residents, made several visits to her, and was accompanied by residents right before and during the delivery procedure. Given the above,

[14] Plaintiffs attempt to minimize the content of these notes by pointing out that the nurse's handwritten observations at the end of the "Intrapartum Phase" or "Intra Delivery Phase" note do not mention any other doctor except Dr. Burgos, and that the second-degree laceration occurred "post-partum, well after the delivery process had been completed." **ECF No. 220** at 16 n.5. As to the first point, the document itself disproves plaintiffs' reading of the nurse's summary, because it also explicitly lists Dr. Chico as assisting in the delivery (whose name is written in the same handwriting as the nurse's note). Regarding the second point, the same document establishes that Dr. Chico performed an episiotomy and that the baby was delivered at 7:08am (as does the "Physician's Delivery Note" signed by Dr. Chico), which is just two minutes before his recorded intervention to repair the second-degree laceration according to the "Obstetrics and Gynecology – On Duty Note." A two-minute difference between the time of birth and the reparation of a vaginal laceration is not "well-after" the conclusion of delivery, as plaintiffs maintain.

it is undisputed that, as a matter of fact, Ms. Seda was treated by HESL residents under the instruction and supervision of Dr. Burgos.

**C. The uncontested material facts establish that Dr. Burgos was in the exercise of his teaching duties when he treated Ms. Seda.**

The only remaining question is whether Dr. Burgos' treatment of Ms. Seda in HESL, which includes his instruction and supervision of the residents that treated her, was done in the performance of his academic and teaching duties. The Court recalls that section 7 of the RAMC Act does not define "academic and teaching duties," and that the *Rodríguez-Cedeño* court considered the phrase to be, in one sense, ambiguous. *Rodríguez-Cedeño v. Sur Med Med. Ctr.*, 977 F. Supp. 2d 115, 118 (D.P.R. 2013) ("The court understands the statute to be ambiguous as it fails to further articulate the applicable framework in order to identify when a hospital's alleged negligent acts are to be awarded the statute's protection."). For present purposes, however, the phrase is not ambiguous *per se* and recourse to the ordinary meaning of the words "academic" and "teaching" suffices.

The Spanish word *académica* is the female form of "academic" and, when used as an adjective in this context, means "belonging or relative to official centers of learning." *Académico, ca*, Diccionario de la Lengua Española, Real Academia Española (23rd ed. 2014), https://dle.rae.es/acad%C3%A9mico?m=form [https://perma.cc/X4YK-9F7K] (last visited Oct. 19, 2026) ("*Perteneciente o relativo a centros oficiales de enseñanza . . . .*"). The word carries much the same meaning in English: "of, relating to, or characteristic of an educational institution or

environment; concerned with the pursuit of research, education, and scholarship; scholarly, educational, intellectual." *Academic (adj.), sense 2*, Oxford English Dictionary, https://doi.org/10.1093/OED/2682278460 (last visited Oct. 19, 2026). For its part, the word *docente*, as an adjective, means "related to teaching." *Docente*, Diccionario de la Lengua Española, Real Academia Española (23rd ed.), https://dle.rae.es/docente [https://perma.cc/TF3L-SVWD] (last visited Oct. 19, 2026) (*"Perteneciente o relativo a la enseñanza."*). In English, "teaching," when used as an adjective, describes something "that teaches, or has the quality or function of teaching." *Teaching (adj.)*, Oxford English Dictionary, https://doi.org/10.1093/OED/4805863157 (last visited Oct. 19, 2026).

Using the ordinary meaning of these words, a medical procedure performed in the exercise of academic and teaching duties is therefore one that is related to or characteristic of a medical educational institution or environment, or that is related to teaching medicine or has the quality or function of teaching medicine.[15] Applying this definition to the undisputed facts shows that Dr. Burgos' treatment of Ms. Seda fits comfortably within Section 7.

---

[15] The Court would reach a similar construction of the phrase "academic and teaching duties" even if it found those words to be ambiguous. The rules of statutory interpretation under Puerto Rico law require that, when a statute's words are ambiguous, their meaning be determined through recourse to, among other things, the statute's reason and spirit or the motivations behind it. *See* **ECF No. 184** at 13. Although unnecessary here, recourse to those factors would ultimately confirm that academic and teaching duties are those related to fulfilling the purposes of the RAMC Act, as evident from its Statement of Motives. *See* **ECF No. 81-15** at 4 ("In order to develop and strengthen educational programs for health professionals and clinical, epidemiological and socio-medical research programs in Puerto Rico, the Regional Medical Centers of Puerto Rico are hereby created through this Bill. These shall be public or non profit private corporations that shall provide support to the accredited Medical Schools of the Island that offer accredited internship and residence programs for health professionals, as well as scientific research centers. Said schools and their affiliates need hospital and outpatient clinical workshops and patients who attend these as indispensable requirements to be able to continue pursuing their educational activities in Puerto Rico.").

As a teaching hospital and as part of ACGME's accreditation requirements, HESL's residency programs must provide both graduate medical education and a clinical learning environment. This is achieved by allowing residents to learn from medical faculty and the hospital's nurses, administrative staff, and ancillary departments. At all relevant times, Dr. Burgos' was a core faculty member of HESL and the Ponce School of Medicine, and his agreements with both entities required that he perform clinical and non-clinical tasks in relation with the residency program. His contract with the Ponce School of Medicine describes his functions and duties as requiring him to "provide clinical opportunities for medical students to develop basic obstetrical and gynecology skills, both outpatient and inpatient activities" in the hospital or in his private office.[16] His contract with HESL required him to, among other things, be involved in the regular teaching and evaluation of residents and provide them with formative feedback, as well as to participate in curriculum design and program evaluation, serve on program committees, and complete the annual ACGME faculty survey. Clearly, these duties and responsibilities were geared towards providing obstetrics and gynecology residents the training and education they needed under the ACGME requirements, thus helping accomplish a critical component of the RAMC Act's purpose.

With this in mind, the medical record shows that Dr. Burgos' treatment of Ms. Seda involved residents at pretty much every stage. As explained above, he is shown to have been

[16] To be clear, and as pointed out in defendants' reply, there is no specific allegation of medical malpractice occurring during Ms. Seda's visits to Dr. Burgos' private office in SOGC prior to December 18, 2020. **ECF No. 239** at 8.

aware of Ms. Seda's condition from her arrival at the hospital on December 18, to have ordered periodic examinations of Ms. Seda, and to have been informed of the results of such examinations. The record also reflects that he consulted with Dr. Andrea Colom on treatment, including Ms. Seda's request for a cesarean or c-section in the evening of December 19, the refusal of which is an important part of plaintiffs' malpractice claim. Also, the record establishes that Dr. Burgos was accompanied by residents immediately prior to taking Ms. Seda to the delivery room at 6:39am and unambiguously states that Dr. Chico and Dr. Colón assisted in the delivery.

As to this last point, plaintiffs emphasize that the medical record does not reflect that anyone other than Dr. Burgos performed the vacuum delivery central to plaintiffs' malpractice claim, and therefore infer that he was not teaching in that exact moment. In his deposition, Dr. Burgos stated that his usual practice with residents and vacuum deliveries was to have the resident operate the vacuum while he held it in place, which he maintains was what he did in Ms. Seda's case. *See* **ECF No. 122-1** at 81-82, 122-125. This is not borne out by the available documentation in the medical record, and plaintiffs point to both Dr. Burgos' own handwritten post-delivery note (**ECF No. 220-6**) and nurse Keila M. Torres-Feliciano's summary note (**ECF No. 209-2** at 30; **ECF No. 163-1** at 174 (cert. trans.)), as having no mention of any resident operating the vacuum. **ECF No. 220** at 14-16.

However, even in the absence of a written record of these actions, as well as considering whatever deficiencies Dr. Burgos' deposition testimony reflects regarding his specific

recollection of the events of that day, they are not enough to negate the presence of residents during the delivery, a fact that is documented and uncontested. The undisputed facts that pertain to Dr. Chico's role are decisive. For example, the relatively short and continuous temporal sequence between the transporting Ms. Seda to the delivery room at 6:39am, the first application of the vacuum machine at 6:44am, the baby's birth at 7:08am, and Dr. Chico's suturing of Ms. Seda's second degree laceration at 7:10am, establishes that he was present in the room during the vacuum procedure. It would be unreasonable to infer the opposite—that Dr. Chico stepped out of the delivery room right after Ms. Seda was taken there and that he only appeared immediately after the baby was born to suture the second-degree laceration. That is inconsistent with the record and common sense, but most importantly, there is no evidence to support that inference.[17] The conclusion that follows from the facts is that he was present throughout the delivery process, not that he was somehow absent.

Teaching can take many forms. In professional education settings such as medicine (as well as law), having students just be present for a procedure to observe how it is performed is an appropriate teaching experience. A well-known adage from traditional medical education comes to mind: "see one, do one, teach one." *See* Christine N. Coughlin, Lisa T. McElroy & Sandy

[17] The Court notes that Dr. Chico is also stated to have performed an episiotomy. An episiotomy is a "surgical incision of the vulva to prevent laceration at the time of delivery or to facilitate vaginal surgery." *Episiotomy*, Stedman's Medical Dictionary, Westlaw STEDMANS 298960 (database updated Nov. 2014). It can also be defined as "the surgical cutting of the vulva during childbirth, to prevent tearing as the newborn passes through the stretched vagina." *Episiotomy*, Attorney's Dictionary of Medicine, LEXIS (last updated Oct. 2026). Evidently, this is not a post-partum procedure.

C. Patrick, *See One, Do One, Teach One: Dissecting the Use of Medical Education's Signature Pedagogy in the Law School Curriculum*, 26 Ga. St. U. L. Rev. 361 (2010) (summarizing the "see one, do one, teach one" educational philosophy once common in the field of medicine). Although the record establishes much more than the residents' mere presence, Dr. Chico's presence during the delivery and that of other residents throughout all stages of Ms. Seda's stay at HESL establish that Dr. Burgos was in fact treating her within the scope of his duties as a member of HESL's core faculty. In the discharge of these duties, Dr. Burgos provided the residents with a clinical opportunity to, under his supervision, train and put in practice their obstetrics and gynecology knowledge and skills. The supervision Dr. Burgos provided, evidenced by his interventions in the medical record, is a key component of the residency structure required by ACGME. This hands-on, supervised opportunity allowed HESL residents to directly interact with the patient, nurses, and hospital staff in furtherance of their medical education.

In conclusion, the Court finds that Dr. Burgos was in the exercise of his academic and teaching duties during Ms. Seda's treatment at HESL, for which reason the medical malpractice liability caps provided for by section 7 of the RAMC Act are applicable in case that he or HESL were to be found liable to plaintiffs for any negligence or fault as result of their treatment of Ms. Seda.

**D. The matter of SOGC's liability for Dr. Burgos' actions or omissions.**

In its Omnibus Opinion and Order, the Court denied summary judgment to SOGC. SOGC had requested summary judgment either dismissing all claims against it or, in the

alternative, declaring that it is also covered by the RAMC Act's liability caps. *See* **ECF No. 90**; **ECF No. 184** at 25-26. Plaintiffs opposed the wholesale dismissal of the claims against SOGC on the grounds that the complaint contains two causes of action against SOGC imputing vicarious liability for Dr. Burgos' negligence and direct liability for its own negligence. *See* **ECF No. 121**. Plaintiffs argued that Ms. Seda contracted with SOGC and that there was no evidence that the agreement excluded the delivery procedure. *Id.*, at 3-4. On reply, SOGC argued that it could not be vicariously liable for Dr. Burgos' actions undertaken on behalf of HESL as a faculty member, as per Article 1540 of the 2020 Puerto Rico Civil Code. *See* **ECF No. 138** at 2 (citing P.R. Laws Ann. t. 31, § 10805). On sur-reply, plaintiffs restated their position as to Ms. Seda's direct contractual relationship with SOGC and the latter's vicarious liability for the actions of Dr. Burgos under Puerto Rico corporate law. **ECF No. 178.**[18]

The Court's decision to deny summary judgment to SOGC was based on the uncertainty surrounding Dr. Burgos' conduct as being in the performance of his teaching duties. And so, the Court stated:

> Because the tortious conduct allegedly took place after Ms. Seda was admitted and while hospitalized at HESL, whether she was treated as a patient of the RAMC or of Dr. Burgos in his private capacity is of paramount importance for [SOGS'] possible liability. If the former is true, then SOGC would be removed from the chain of causation, as it would have not been involved in the delivery procedure.
>
> …

[18] The jump between Puerto Rico civil and corporate law is explained by plaintiffs having premised SOGC's liability under both legal precepts. *See* **ECF No. 33** at ¶¶ 87, 102 (referring to the Puerto Rico Civil Code), 106 (referring to Puerto Rico corporate law).

> If HESL and Dr. Burgos were exercising teaching duties when Ms. Seda was treated, Dr. Burgos then could not have been acting on behalf of SOGC when the alleged tort occurred. SOGC would not be liable for his allegedly negligent conduct.

**ECF No. 184** at 27-28. In its motion to join HESL's supplemental motion for partial summary judgment, SOGC again requested dismissal of the claims against it. **ECF No. 211** at 3. Plaintiffs' opposition to the supplemental motion makes no reference or argument as to this request.

Having concluded that Dr. Burgos was in the exercise of his academic and teaching duties when Ms. Seda was treated at HESL, the Court can now tie this loose end. In the amended complaint, plaintiffs claim that SOGC failed to comply with general obligations to abide by the applicable standard of care and to follow or have in place applicable regulations, policies, and procedures, as well as to properly train and supervise the medical staff that provided care to Ms. Seda. *See* **ECF No. 33** at ¶¶ 75-88, 92-102. The lynchpins of this liability are (i) the vicarious liability of private employers imposed by article 1540 of the Puerto Rico Civil Code, P.R. Laws Ann. t. 31, § 10805, for damages caused by their employees' negligence acting "on occasion of their functions;" and (ii) the joint liability imposed by Puerto Rico corporate law on professional services corporation, P.R. Laws Ann. t. 14, § 3926, for the negligent actions of their "officers, employees, agents or shareholders while they are engaged [o]n behalf of the corporation in the rendering of professional services."[19]

[19] The translation of Article 1540 was provided by defendants in their reply, **ECF No. 138** at 2, and no party objected to it.

The factual allegations concerning SOGC, however, are limited to Ms. Seda's prenatal visits to Dr. Burgos at SOGC's offices and do not reflect any negligent action or omission. *Id.*, at ¶¶ 25-29. Any negligence attributable to SOGC would therefore have to be based on Dr. Burgos' negligent acts and omissions alleged to have occurred during her stay at HESL. As the facts above show, Dr. Burgos' actions and omissions in his treatment of Ms. Seda at HESL were undertaken in the performance of his academic and teaching duties, duties that he owed to HESL and the Ponce School of Medicine. This observation collapses the indeterminacy regarding on whose behalf and in what capacity Dr. Burgos was acting when he treated Ms. Seda at HESL from December 18 to 20, 2020. Therefore, any negligence committed by Dr. Burgos for treatment during that time would be attributable to HESL, not SOGC.

Accordingly, the Court sees no basis for imposing liability on SOGC for the allegedly negligent actions of Dr. Burgos. Summary judgment dismissing all claims in favor SOGC is **GRANTED**.

## VI. Conclusion

In the event that Dr. Burgos and/or HESL are found to have been negligent in their treatment of Ms. Seda during her time at HESL's facilities, she may be entitled to damages in an amount of several hundred thousand or millions of dollars. However, by legislative command, these damages would be capped, at most, at $150,000 pursuant to the protections afforded to HESL and Dr. Burgos under Section 7 of the RAMC Act. In addition, because Dr. Burgos' treatment of Ms. Seda took place while in the performance of his academic and teaching duties,

there is no basis to attribute liability to SOGC, as he was not acting on the corporation's behalf at the moment the alleged negligence occurred. Accordingly, the Court **GRANTS** HESL's supplemental motion for partial summary judgment (**ECF No. 208**) and further **GRANTS** summary judgment in favor of SOGC.

**SO ORDERED**.

At San Juan, Puerto Rico, on this 13th day of November 2026.

**S/AIDA M. DELGADO-COLÓN**
**United States District Judge**